**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**Timothy O. Plunkett,**

    **Plaintiff,**

**-V-**                                                                          **Case No. 2:2004cv0110**
                                                                         **JUDGE SMITH**
                                                                         **Magistrate Judge Abel**

**Smurfit-Stone Container Corp.,**
**et al.,**

    **Defendants.**

## OPINION AND ORDER

Plaintiff asserts claims against his employer and his union under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4). Defendant International Union of Operating Engineers, Local 18D ("Union") moves for summary judgment (Doc. 33). Defendant Smurfit-Stone Container Corp. ("Stone") also moves for summary judgment (Doc. 35). For the reasons that follow, the Court grants defendants' summary judgment motions.

### I. Facts

Plaintiff is an individual citizen of Ohio. He is a member of defendant Union. He works for defendant Stone. Stone owns and operates a paper production and distribution plant located in Coshocton County, Ohio. Stone employs about 206 hourly workers at the Coshocton plant. Most of the hourly production jobs at Stone fall within lines of progression which contain five to seven

different interrelated positions within a process.  The lines of progression include the Paper Mill, the Pulp Mill, Shipping/Receiving, and Storeroom.  Some rare positions, such as the stock prep position, have been placed to the side of a line of progression pursuant to negotiations between the Union and Stone, but are considered stand alone jobs.  One of the purposes of creating lines of progression is to ensure that when a job opening occurs, the person below already has experience and can move into the position without a lengthy learning curve.  The goal is achieved as workers in a line of progression interact on a daily basis, cover for each other and continually train for the position above them.  This system keeps loss of production to a minimum, and enhances safety and efficiency.

Plaintiff began working for Stone's predecessor as a hydropulp operator on September 18, 1987.  He worked as a hydropulp operator for ten years, after which he moved up the line of progression and began working as a water treatment operator.  Plaintiff moved up to the water treatment operator position because he learned the position while working as a hydropulp operator.

In 2001, plaintiff was bumped from the water treatment operator position.  Plaintiff, in turn, used his seniority to bump into the stock prep position.  The stock prep position was a "dead end job" outside of the line of progression.

On April 30, 2001, before plaintiff selected to bump into the stock prep position, he filed a grievance requesting the opportunity to bump into an apprenticeship and maintenance department training program.  Plaintiff had no training in any journeyman or apprentice programs for maintenance positions.  Stone's human resources manager, Wes Enlow, explained to plaintiff that there was no Stone apprenticeship training program and that there were no plans to reinstate the

2

program.

Plaintiff trained and learned the stock prep position in three weeks. He received no complaints about his training.

In July 2002, Stone eliminated some Storeroom positions. As a result, bargaining unit employees expressed concern about the uncertainty of the procedures for bumping into and learning new positions when jobs were eliminated. In response, the Union conducted a membership meeting on July 9, 2002. At the meeting, it was agreed that if an employee stayed within the same classification, he could bump into any classification below him and become the most senior person in that classification. If the employee bumped into a position outside his line of progression, he would become the most junior person in that classification and would have forty-five days to learn the new position. If the employee was unable to learn the new position within forty-five days, he would be assigned to the labor pool in accordance with his seniority.

On July 11, 2002, Union representatives met with Enlow and general manager Daniel Truett to discuss the Union's proposal. Enlow and Truett agreed to the proposal conditioned upon Union membership approval. The Union conducted three membership meetings on July 16, 2002 to discuss and vote on the proposal. The proposal passed on a vote of thirty-one to two.

Some time in 2003 it became known that Stone intended to eliminate six positions: two in the pulp utility classification, and four stock prep positions. Plaintiff's stock prep position was one of those being eliminated. Plaintiff again sought to apply for the nonexistent maintenance millwright apprenticeship program. Enlow again told plaintiff that no such program existed, and that plaintiff was prohibited from testing into the position absent some kind of millwright training certification. The union steward, Rick McKee, also told plaintiff that the only way plaintiff could

take the millwright test was to present documentation of prior training. On June 8, 2003, plaintiff filed a grievance complaining about the absence of a millwright apprenticeship training program. On June 25, 2003, the Union informed plaintiff in writing that his grievance was denied because there was no training program and he did not have the proper training to take the millwright test.

Plaintiff then decided to bump into the winderman position. He had no prior experience as a winderman or in the positions below it in the line of progression. McKee told plaintiff and other stock prep employees that the winderman position was complicated and that forty-five days was not long enough to learn the job. Despite being so informed, plaintiff bumped into the winderman position. He also filed a grievance asserting that forty-five days was an inadequate time period within which to learn the winderman position. On June 25, 2003, the Union informed plaintiff in writing that his grievance was denied and that in a "bumping situation you have 45 days to learn and perform the job or you will go to a labor position."

On June 26, 2003, the Union and Stone memorialized the 2002 forty-five day agreement in writing. Enlow felt it was necessary to reduce the 2002 agreement to writing so that all employees would understand that the same bumping rules that applied in 2002 would apply in 2003. Enlow also explained why the forty-five day training rule also applied to four difficult and "critical" positions in the plant:

> Q. You indicated earlier that there were some key positions, winderman, backtender –
>
> A. Winderman, backtender, machine tender, refining engineer.
>
> Q. Okay. And these were highly-skilled positions?
>
> A. Highly – yes.
>
> Q. Okay. And difficult positions –

>   A.   Yes.
>
>   Q.   – to learn?  Why then would you agree with the union that people only had 45 days to train into those positions?
>
>   A.   Well, there's several reasons.  One is we feel that if people had the expertise, the mechanical ability, they could do it in 45 days.  Another reason is that job – or those jobs are so important, that you can't have somebody on their training six, seven, eight, nine, ten months.  You've got to have people to get that because those jobs are the ones that make the paper and keep this plant in – in this community.

Enslow Dep. at 106.

Plaintiff received forty-five days of training for the winderman position.  After the forty-five days, plaintiff was disqualified because he was still unable to perform the duties necessary to the position.  Plaintiff was then transferred to the labor pool.  On August 25, 2003, plaintiff filed a second grievance challenging the forty-five day training period for the winderman position.  The Union provided plaintiff a written response denying the grievance on September 22, 2003.

On December 8, 2003 plaintiff filed a discrimination charge with the EEOC.  Plaintiff received his right-to-sue letter on March 2, 2004.  Plaintiff filed the instant lawsuit on March 10, 2004.

**II.  Summary Judgment**

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

>   The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see also</u> <u>Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. <u>Id.</u> Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. <u>Id.</u>

The Sixth Circuit Court of Appeals has recognized that

Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific

portions of the record upon which it seeks to rely to create a genuine issue of material fact. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

### III. Discussion

#### A. Statute of Limitations

Both the Union and Stone first argue that plaintiff's LMRA § 301 claims are barred under the applicable statute of limitations. Plaintiff concedes that his claims regarding the lack of a millwright apprenticeship training program were filed beyond the statute of limitations. Plaintiff asserts, however, that his claims concerning the application of the forty-five day training rule to the winderman position were timely filed.

The six-month limitations period of §10(b) of the National Labor Relations Act governs actions brought under LMRA § 301. DelCostello v. Teamsters, 462 U.S. 151, 163 (1983). "A claim under § 301 accrues when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." Noble v. Chrysler Motors Corp., 32 F.3d 997, 1000 (6th Cir.1994)(internal quotation marks and citations omitted).

The following dates are significant to the determination of whether plaintiff filed his claims within the six-month limitations period:

- On June 25, 2003, plaintiff received written notice from the Union that his June 8, 2003 grievance concerning the forty-five day training period for the winderman position was not well-taken.

- On September 22, 2003, plaintiff received written notice from the Union that his August 25, 2003 grievance concerning his disqualification from the winderman

position under the forty-five day rule was not well-taken.

- On March 10, 2004, plaintiff filed the instant lawsuit.

Plaintiff contends that claims were timely filed within six months following the Union's September 22, 2003 denial of his August 25, 2003 grievance. Defendants however, maintain that a plaintiff asserting a claim under LMRA § 301 cannot toll the statute of limitations by filing successive grievances concerning the same subjects. They argue that the statute began to run on June 25, 2003, when the Union gave plaintiff written notice that his June 8, 2003 grievance was denied.

Defendants rely on Sutherland v. Day & Zimmerman, Inc., 894 F. Supp. 1488 (D.C. Kansas 1995). The court in Sutherland stated:

> Defendants argue that the plaintiff's claim is barred by the six-month statute of limitations. As to the first three grievances, all of which deal with plaintiff's allegation that his seniority should have been determined under the 1970 CBA, the court agrees. These grievances were decided more than a year before plaintiff filed this action, and the plaintiff knew of the union's decision not to pursue the complaint further no later than the lay-off on October 12, 1989. The plaintiff cannot toll the statute of limitations by repeatedly filing grievances on the same issue or other issues. Therefore, plaintiff's claim that the defendants misinterpreted the CBA or that his seniority should have been decided based on the 1970 CBA is time-barred.

894 F. Supp. at 1493.

Similarly, in the instant case, plaintiff filed two grievances challenging the forty-five day training rule. Under Sutherland, the filing of the second grievance does not toll the statute of limitations.

Plaintiff attempts to avoid this ruling by characterizing his second grievance as one challenging his disqualification from the winderman position rather than the forty-five day training rule. The Court rejects plaintiff's argument. The substance of both grievances is the application

9

of the forty-five day training rule to the winderman position.  The Court concludes that the six-month statute of limitations began to run when plaintiff received notice from the Union on June 25, 2003 that his June 8, 2003 grievance was denied.  Since plaintiff did not file this lawsuit within six months after June 25, 2003, his LMRA § 301 claims are time-barred.

### B.  Merits of § 301 claim

Although the above ruling is dispositive of plaintiff's § 301 claims, the Court will briefly examine the merits of the claims as an alternative basis for its decision.

A hybrid § 301 lawsuit entails two claims: the employer's breach of the collective bargaining agreement ("CBA"), and the union's breach of the duty of fair representation.  Garrison v. Cassens Transport Co., 334 F.3d 528, 538 (6th Cir. 2003).  The two claims are "'inextricably interdependent,'" and a plaintiff cannot succeed against either party unless he demonstrates both violations.  Id. (quoting DelCostello v. Teamsters, 462 U.S. 151, 164 (1983)).

#### 1.  Breach of CBA

Defendants argue that Stone did not breach the terms of the CBA.  Plaintiff contends that the CBA provides that an employee is entitled to a "reasonable time to learn and become proficient in [a] . . . job."  Plaintiff asserts that forty-five days is not a reasonable time within which to learn the winderman position, and therefore application of the forty-five day rule to the winderman position violates the CBA.

The Court disagrees.  The CBA does not define "reasonable period."  In 2002, the Union approached Stone and proposed that when an employee bumps into a position outside of the line of

progression, the "reasonable period" to learn and become proficient at the position would be forty-five days. Stone agreed to the proposal, and the Union membership ratified the agreement. Such a side agreement is deemed included in the CBA. See Inlandboatmen's Union v. Dutra Group, 279 F.3d 1075, 1079 (9th Cir. 2002). In light of this, Stone did not breach the CBA by disqualifying plaintiff after he was unable to learn the winderman position within the forty-five day period.

### 2. Breach of duty of fair representation

To prove a breach of the duty of fair representation, the employee must show that the union's actions or omissions in the grievance process were arbitrary, discriminatory, or in bad faith. Garrison, 334 F.3d at 538. Each of these three wrongs represents an independent avenue by which an employee may prove a breach of the duty of fair representation. Id.

As to arbitrariness, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Id. (quoting Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 67 (1991)). Mere negligence, ordinary mistakes, errors, or flaws in judgment do not satisfy this standard. Id. An unwise or even an unconsidered decision by the union is not necessarily irrational. Id. To prevail, a plaintiff must demonstrate that the union's actions were "wholly irrational." Id. "Wholly irrational" equates with "extreme arbitrariness." Id. In fact, "a union acts arbitrarily only if it handles a grievance in a 'perfunctory' manner, with caprice or without rational explanation." Linton v. United Parcel Serv., 15 F.3d 1365, 1370 (6th Cir.1994) (quoting Poole v. Budd Co., 706 F.2d 181, 183 (6th Cir.1983)).

"Judging whether a union has acted discriminatorily or in bad faith ordinarily presents a

11

simple and straightforward issue." Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 585 (6th Cir. 1994). Conduct based on unlawful discrimination or bad faith can never be reasonable. Id. at n. 18.

The Union asserts that its decision not to pursue plaintiff's grievance concerning the forty-five day training rule was rational in light of Enlow's explanation for the rule. First, Enlow stated that if people had the expertise, they could learn the job in forty-five days. Second, certain critical jobs, including the winderman position, were so important that Stone could not wait a longer period of time for someone to train for them. Enlow Dep. at 106-07. In light of these reasons, the Court finds as a matter of law that the Union's decision not to pursue plaintiff's grievance was not arbitrary.

The Union also argues that plaintiff has offered no evidence of discrimination. The Court finds that plaintiff has submitted nothing more than his own speculation to support his assertion of discrimination. The Court therefore concludes as a matter of law that the Union's decision not to pursue plaintiff's grievance was not motivated by discrimination.

For the above reasons, defendants are entitled to summary judgment in their favor on plaintiff's LMRA § 301 claims.

### C. Associational discrimination

The ADA prohibits associational discrimination. 42 U.S.C. § 12112(b)(4). Plaintiff asserts that both the Union and Stone discriminated against him because of his association with his disabled wife and daughter. Specifically, plaintiff contends that defendants were motivated to act against him because of the high cost of maintaining his medical insurance.

The only evidence plaintiff submits to support his discrimination claim is that while he was training for the winderman position, Mr. Crown and Dan Truett approached him and inquired as to the health of his wife and daughter.  Aside from this, plaintiff offers no more than his speculation that the only reason defendants could have had for their actions was discrimination.  See Plunkett Dep. at  228-32.  Notably, none of the actions by the Union or Stone resulted in an elimination or reduction of plaintiff's health insurance coverage.

In these circumstances, the Court finds as a matter of law that plaintiff has failed to offer sufficient evidence to support his discrimination claim under either a direct evidence theory or by demonstrating a prima facie case of discrimination.  For this reason, defendants are entitled to summary judgment in their favor on plaintiff's ADA claim.

### IV.  Disposition

Based on the above, the Court grants defendants' motions for summary judgment.

The Clerk shall enter a final judgment in this action, in favor of defendants, and against plaintiff, dismissing this action with prejudice.

The Clerk shall remove Doc. 33 and Doc. 35 from the Court's pending CJRA motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**